**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **AMERICAN PETROLEUM INSTITUTE AND ENERGEO ALLIANCE,** | **CIVIL ACTION   NO. 2:21-cv-00905** |
| **Plaintiffs,** | **SECTION "A"    Division: 2** |
| **v.** | **JUDGE JAY C. ZAINEY** |
| **GINA RAIMONDO, in her official capacity as the Secretary of Commerce; and NATIONAL MARINE FISHERIES SERVICE,** | **MAG. JUDGE DONNA P. CURRAULT** |
| **Defendants.** | |

## <u>AMERICAN PETROLEUM INSTITUTE AND ENERGEO ALLIANCE'S SECOND AMENDED COMPLAINT</u>

### I.     SUMMARY OF ACTION

1.     The American Petroleum Institute ("API") and EnerGeo Alliance ("EnerGeo") (collectively, "Plaintiffs") hereby challenge the decision of the National Marine Fisheries Service ("NMFS") of the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, to issue a final rule promulgating regulations governing the unintentional taking of marine mammals incidental to geophysical surveys related to oil and gas activities in the Gulf of Mexico, pursuant to Section 101(a)(5)(A) of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371(a)(5)(A) (the "Final Rule"). 86 Fed. Reg. 5322 (Jan. 19, 2021), *as amended* 89 Fed. Reg. 31,488 (Apr. 24, 2024); 50 C.F.R. §§ 217.180-217.187. On April 24, 2024, NMFS issued a final rule that made changes to the 2021 version of the Final Rule, but otherwise

affirmed its original analyses and findings.[1] These changes do not materially affect the specific aspects of the Final Rule challenged in this lawsuit. Accordingly, Plaintiffs challenge the Final Rule on the bases that it continues to violate the MMPA, 16 U.S.C. § 1361, *et seq.*, and is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, in two specific ways.

2.    First, the Final Rule violates the MMPA and the APA because NMFS failed to use the best available scientific information, failed to consider relevant factors, and made arbitrary and unsupported decisions in determining the numbers of marine mammals that would be incidentally taken by sound produced by Gulf of Mexico geophysical surveys. This resulted in a substantial overestimate of marine mammal incidental take and a gross inflation of anticipated impact of the geophysical surveys rather than an impact estimate objectively based on the best available scientific information, as required by the MMPA. Second, the Final Rule violates the MMPA and the APA because it arbitrarily imposes a coastal seasonal closure on all geophysical surveys that is contrary to the best available scientific information, is contrary to NMFS's own findings and decisions, has no benefit to marine mammals, and will have significant negative impacts.

3.    Plaintiffs respectfully request that the Court declare the Final Rule unlawful for the reasons set forth in this Second Amended Complaint and remand the Final Rule to NMFS to address these two specific violations. Plaintiffs further request that the Court vacate the unlawful seasonal closure provision and leave the remainder of the Final Rule intact while NMFS completes the remand.

---

[1] The term "Final Rule" in this Second Amended Complaint refers the 2021 final rule as amended by the 2024 final rule.

## II.    PARTIES

### A.    Plaintiffs

4.    API is the primary national trade association of the oil and gas industry. API represents nearly 600 member companies involved in all aspects of the U.S. oil and gas industry, including explorers, producers, refiners, suppliers, pipeline operators, marine transporters, and service and supply companies. Together with its member companies, API is committed to ensuring a strong, viable U.S. oil and gas industry capable of meeting the energy needs of the Nation in an efficient and environmentally responsible manner. API's overall purpose includes representation of the interests of the oil and gas industry in litigation. API also develops oil and gas standards, conducts and sponsors research, engages with regulatory agencies, and participates in regulatory processes on behalf of its members and the oil and gas industry.

5.    API's members are directly engaged in oil and gas exploration in the Gulf of Mexico and have for decades been among the principal developers of offshore leases in the Gulf of Mexico. In addition to leaseholders and operators, API's members include companies that conduct geophysical and geological ("G&G") exploration activities and provide support services for offshore oil and gas development. These members provide, among other things, material, equipment, and other support services to federal lessees in developing their oil and gas resources. API's members conduct geophysical surveys subject to the Final Rule, and have applied for or obtained, or plan to apply for and obtain, MMPA authorizations pursuant to the Final Rule, and are therefore subject to the requirements of the Final Rule.

6.    Almost all of API's members' Gulf of Mexico activities occur in areas offshore of Louisiana or Texas, with most of the associated vessel traffic to those areas originating from the Port of Galveston, Texas, and the Port of Fourchon, Port of Morgan City, and Port of Iberia,

Louisiana. Overall, API members invest billions of dollars each year to further the exploration and development of the oil and gas resources of the Gulf of Mexico. The federal government's regulation of G&G activities in the Gulf of Mexico, including geophysical surveys addressed in the Final Rule, necessarily and directly implicate, and are germane to, the core interests of API and its members.

7.      EnerGeo is a private non-profit trade association that represents approximately 50 members from all segments of the geophysical and exploration industry.[2] EnerGeo engages governments and stakeholders worldwide on issues central to geophysical operations and exploration access. EnerGeo's mission is to optimize the business and regulatory climate for its members, enhance public understanding of the energy geoscience industry, and ensure a strong, viable geophysical and exploration industry. EnerGeo has existed for over 50 years, and is the only global trade organization solely dedicated to the energy geoscience exploration industry.

8.      EnerGeo works vigorously on behalf of its members on issues of common interest and industry-wide topics and initiatives that support the continued vitality of the geoscience industry. Through advocacy, outreach, and development of industry guidelines, EnerGeo focuses on issues that affect the core businesses of the geoscience industry, including issues involving the ability of its members to conduct exploratory activities on the U.S. Outer Continental Shelf ("OCS") and, specifically, the Gulf of Mexico. For example, EnerGeo (i) engages government and regulatory entities with credible scientific, technical, and legal analyses to both protect the

---

[2] One of the original plaintiffs in this case included an entity formerly known as the International Association of Geophysical Contractors ("IAGC"), which was subsequently renamed as EnerGeo Alliance. This Court previously granted Plaintiffs' motion to substitute IAGC with EnerGeo as a plaintiff. Dkts. 36 & 37. For consistency, this Second Amended Complaint refers to EnerGeo when discussing events occurring before IAGC changed its name.

environment and develop essential energy supplies; (ii) educates its members on regulatory initiatives and policies affecting the geoscience industry; (iii) organizes consistent industry positions on emerging policy and regulatory issues; (iv) participates in regulatory proceedings affecting its members and the geoscience industry; and (v) when necessary, engages in litigation on matters that affect its members and the geophysical and exploration industry.

9.      EnerGeo and its members have longstanding and fundamental interests in the conduct and regulation of G&G exploration activities, including, significantly, in the Gulf of Mexico. EnerGeo's members conduct geophysical studies and analyze data that is essential to the discovery and delivery of oil and natural gas resources in the Gulf of Mexico. Indeed, many of the G&G activities carried out in the Gulf of Mexico are performed by EnerGeo members. EnerGeo's members conduct geophysical surveys subject to the Final Rule, and have applied for or obtained, or plan to apply for and obtain, MMPA authorizations pursuant to the Final Rule, and are therefore subject to the requirements of the Final Rule. Almost all of EnerGeo's members' Gulf of Mexico activities occur in areas offshore of Louisiana or Texas, with most of the associated vessel traffic to those areas originating from the Port of Galveston, Texas, and the Port of Fourchon, Port of Morgan City, and Port of Iberia, Louisiana. The federal government's regulation of G&G activities in the Gulf of Mexico, including geophysical surveys addressed in the Final Rule, necessarily and directly implicate, and are germane to, the core interests of EnerGeo and its members.

10.     Because of the direct and significant interests of their members, API and EnerGeo have been active stakeholders in all of the statutory and administrative processes leading to issuance of the Final Rule (including the 2023 revisions). API and EnerGeo submitted detailed comment letters and other relevant technical information in response to NMFS's public

5

notification of the Bureau of Ocean Energy Management's ("BOEM") petition for incidental

take regulations. 81 Fed. Reg. 88,664 (Dec. 8, 2016). API and EnerGeo also submitted detailed

comment letters and other relevant technical information in response to NMFS's public

notifications of its proposed rules. *See* 83 Fed. Reg. 29,212 (June 22, 2018); 88 Fed. Reg. 916

(Jan. 5, 2023). In addition, API and EnerGeo participated in related public processes, such as the

federal environmental review of the activities addressed in the Final Rule pursuant to the

National Environmental Policy Act ("NEPA"). *See* 82 Fed. Reg. 36,418 (Aug. 4, 2017).

11.    As a result of the location and nature of oil and gas activities, including G&G

surveys, in the Gulf of Mexico, Plaintiffs' members have substantial direct experience, data, and

knowledge about marine mammal behavior, activity, and habitat in the Gulf of Mexico, and

about interactions between industry and marine mammals in the Gulf of Mexico. This

experience, data, and knowledge bears directly upon the best available scientific evidence

relevant to the Final Rule and related agency decisions.

**B.    Defendants**

12.    NMFS is an agency of the National Oceanic and Atmospheric Administration of

the United States Department of Commerce. NMFS has been delegated the responsibility for

administering the provisions of the MMPA, including Section 101(a)(5)(A), with regard to

certain marine mammals inhabiting the Gulf of Mexico. The authority delegated to NMFS to

administer and to implement the MMPA is subject to, and must be in compliance with, the

applicable requirements of the MMPA and the APA.

13.    Gina Raimondo, in her official capacity as Secretary of Commerce, directs all

business of the Department of Commerce, including NMFS. In her official capacity as Secretary

of Commerce, Ms. Raimondo is responsible for the Final Rule and for the associated violations of the MMPA and the APA as alleged in this Complaint.

## III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), and 28 U.S.C. § 2202 (further relief).

15.    Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because the activities, species, and geographic areas at issue in and affected by the Final Rule are located in this district, and Plaintiffs' members reside and do business in this district.

## IV.    STATUTORY FRAMEWORK

### A.    The Administrative Procedure Act

16.    The APA provides for judicial review of final agency action. 5 U.S.C. § 702. The APA also authorizes courts reviewing agency action to hold unlawful and set aside final agency action, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id*. § 706(2)(A). Decisions by NMFS to promulgate incidental take regulations under Section 101(a)(5)(A) of the MMPA, 16 U.S.C. § 1371(a)(5)(a), are subject to judicial review under this provision of the APA.

### B.    The Marine Mammal Protection Act

17.    With certain exceptions, the MMPA generally prohibits the "taking" of marine mammals. 16 U.S.C. § 1371(a). The MMPA defines "take" to mean "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id*. § 1362(13). The MMPA further defines two types of take by "harassment." Level A harassment is "any act of pursuit, torment, or annoyance which … has the potential to injure a marine mammal or marine mammal

stock in the wild." *Id*. § 1362(18)(A)(i). Level B harassment is "any act of pursuit, torment, or annoyance which … has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id*. § 1362(18)(A)(ii).

18.     The MMPA provides NMFS with the authority to allow, by regulation, the incidental, but not intentional, taking of "small numbers" of marine mammals in response to petitions by "citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographic region." *Id*. § 1371(a)(5)(A)(i). In promulgating such regulations, NMFS must find that "the total of such taking during each five-year (or less) period concerned will have a negligible impact" on the affected marine mammal species or stocks. *Id*. § 1371(a)(5)(A)(i)(I). NMFS must also identify "permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on the species … and its habitat…." *Id*. § 1371(a)(5)(A)(i)(II)(aa). To authorize specific instances of take, NMFS issues letters of authorization ("LOAs") to requesting parties that meet the terms and conditions of the regulations. 50 C.F.R. § 216.106.

19.     In promulgating regulations under Section 101(a)(5)(A) of the MMPA, NMFS is required to objectively use the "best scientific evidence available," applying the standards of Section 101(a)(5)(A). 50 C.F.R. §§ 216.102(a), 216.104(c); *see also* 16 U.S.C. § 1371(a)(3)(A).

20.     A petition for promulgation of regulations under Section 101(a)(5)(A) of the MMPA must describe, *inter alia*, "the number of marine mammals (by species) that may be taken," "the number of times such takings by each type of taking are likely to occur," and "the anticipated impact of the activity upon the species or stock of marine mammal." 50 C.F.R. § 216.104(6), (7).

119418579.6 0078439-00060

C.      **The Outer Continental Shelf Lands Act**

21.     The Outer Continental Shelf Lands Act ("OCSLA") calls for the "expeditious and orderly development" of the OCS "subject to environmental safeguards." 43 U.S.C. § 1332(3). Congress enacted OCSLA to "achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. § 1802(1). When enacting OCSLA, Congress expressly intended to "make [OCS] resources available to meet the Nation's energy needs as rapidly as possible." *Id*. § 1802(2)(A).

22.     The geophysical activities addressed by the Final Rule are authorized by BOEM pursuant to OCSLA. *See* 43 U.S.C. § 1340. Neither OCSLA nor the MMPA requires an applicant for a geophysical permit under OCSLA to obtain an incidental take authorization under the MMPA. However, unauthorized incidental takes of marine mammals may be subject to penalties under the MMPA. *See* 16 U.S.C. § 1375.

## V.      STATEMENT OF FACTS

23.     In 2002, BOEM submitted a petition to NMFS for the promulgation of regulations under Section 101(a)(5)(A) of the MMPA to authorize the take of marine mammals incidental to conducting geophysical surveys during oil and gas industry exploration and development activities in the Gulf of Mexico. That petition was revised numerous times over numerous years, until it was submitted in final form on October 17, 2016, and deemed adequate and complete by NMFS.

24.     By BOEM's admission, the modeling it used in its revised petition to estimate the anticipated number of marine mammal takes incidental to geophysical surveys was intentionally designed to overestimate takes and impacts. Specifically, BOEM stated in its revised petition that

the "modeling results are meant to be precautionary and likely overestimate 'exposures' and therefore 'takes'" and that the "modeling inputs and results are purposely precautionary in order to avoid underestimating potential impacts to marine mammals."

25.     BOEM used the same modeling results in its NEPA review for the activities addressed in the Final Rule. In the draft programmatic environmental statement ("draft EIS") it prepared for that NEPA review, BOEM stated that "[e]ach of the inputs into the models [used by BOEM] is purposely developed to be conservative, and this conservativeness accumulates throughout the analysis." In the draft EIS, BOEM stated that the model "requires accepting a worst-case scenario, which ultimately overestimates the numbers of 'take' under the MMPA by equating those numbers with the exposures identified in the modeling rather than real world conditions."

26.     In the draft EIS, BOEM further explained: "The existing modeling largely does not account for uncertainty in the data inputs and also selects highly conservative data inputs. This bias often produces unrealistically high exposure numbers and 'takes' that exponentially increase uncertainty throughout each step of the modeling. The modeling does not incorporate mitigation or risk reduction measures designed to limit exposure. The modeling is an overestimate and should be viewed with that understanding."

27.     On December 8, 2016, NMFS published notice of receipt of BOEM's revised petition in the Federal Register, requesting comments and information from the public. 81 Fed. Reg. 88,664 (Dec. 8, 2016). API and EnerGeo timely filed detailed comments and technical information in response to NMFS's notice.

28.     On June 22, 2018, NMFS published a notice of proposed rulemaking for Gulf of Mexico geophysical survey incidental take regulations in the Federal Register for public review

and comment. 83 Fed. Reg. 29,212 (June 22, 2018) ("2018 Proposed Rule"). API and EnerGeo

timely filed detailed comments and technical information in response to NMFS's notice.

29.    In the 2018 Proposed Rule, NMFS presented marine mammal incidental take

estimates based, in substantial part, upon the modeling that BOEM performed in its revised

petition and in its associated NEPA review process. In the 2018 Proposed Rule, NMFS stated

that its modeling "leads to substantial overestimates of the numbers of individual potentially

disturbed [and] ... to an overestimation of the population-level consequences of the estimated

exposures," and that, even with the application of a correction factor, the modeling still

represents an "overestimate" and is "purposely conservative." 83 Fed. Reg. at 29,259, 29,291.

NMFS did not quantify or otherwise identify the amount of the overestimate and did not analyze

the extent to which its modeling overestimated marine mammal incidental take. NMFS also

proposed a seasonal coastal closure provision applicable to geophysical surveys in the Gulf of

Mexico.

30.    On January 19, 2021, NMFS issued the Final Rule. The regulations promulgated

by the Final Rule became effective on April 19, 2021. 86 Fed. Reg. 5322 (Jan. 19, 2021).

31.    On May 6, 2021, Plaintiffs filed the present civil action against NMFS alleging

that the Final Rule violates the MMPA and is arbitrary and capricious in violation of the APA.

On September 14, 2021, Plaintiffs filed their unopposed First Amended Complaint. In February

2022, NMFS announced it would conduct a supplemental rulemaking to reassess its incidental

take findings in the Final Rule after discovering that estimates of incidental take of marine

mammals anticipated from activities analyzed for the Final Rule were erroneous. Shortly after

that, this Court granted the parties' motion to stay and administratively closed the case until a

revised incidental take rule had been posted on the Public Inspection webpage of the Federal

Register. The Court's order directed the Clerk to lift the stay and administratively reopen the case upon filing by either party of a notice informing the Court of the posting of the revised incidental take rule. Dkt. 46. The Court's order also directed Plaintiffs to, within 30 days of the notice, "file (a) any amended or supplemental complaint in light of subsequent events, or (b) a notice with the Court that no amendment to or supplementation of the complaint is necessary." *Id*. On April 23, 2024, Plaintiffs filed a notice stating that the revised incidental take rule had been posted on the Public Inspection webpage of the Federal Register and requesting that the case be administratively reopened. Dkt. 48. On April 24, 2024, the Court issued an order setting a status conference for May 23, 2024. Dkt. 51.

32.    On January 5, 2023, NMFS published a notice of proposed rulemaking for Gulf of Mexico geophysical survey incidental take regulations in the Federal Register for public review and comment. 88 Fed. Reg. 916 (Jan. 5, 2023) ("2023 Proposed Rule"). NMFS explained that it was reopening the rulemaking process after discovering that BOEM had erroneously underestimated the total predicated exposures of species from all survey activities, which precluded NMFS from issuing LOAs for the full amount of geophysical survey activities originally described by BOEM in its petition. API and EnerGeo timely filed detailed comments and technical information in response to NMFS's notice.

33.    The 2023 Proposed Rule presented a new "negligible impact" analysis that purported to address BOEM's error. NMFS preliminarily concluded that its updated analysis did not result in a need to revise mitigation and monitoring measures and that the regulations implemented by the Final Rule issued in 2021 did not need to be altered. In the analyses supporting the 2023 Proposed Rule, NMFS made no changes to the overly conservative aspects of its approach to estimating levels of marine mammal incidental take. Instead, and in direct

contrast to its responses to comments on the 2018 Proposed Rule, NMFS admitted that "[for] purposes of the negligible impact analyses, NMFS uses the 'worst-case' (*i.e.*, the maximum of the estimates from the three airgun array configurations/sizes) species-specific exposure modeling results." 88 Fed. Reg. at 929.

34.     On April 24, 2024, NMFS issued a final rule implementing revisions to the Final Rule. 89 Fed. Reg. 31,488 (Apr. 24, 2024). The Final Rule, as amended, retains all mitigation and monitoring measures and makes no changes to the arbitrary and overly conservative aspects of NMFS's approach to estimating levels of marine mammal incidental take challenged in this lawsuit. NMFS continues to apply the same "worst-case" scenario methodology to estimate take, but has rebranded its approach as an analysis "based on the modeling results presenting the highest estimated take number for each species." *Compare* 88 Fed. Reg. at 920 *with* 89 Fed. Reg. at 31,492; *see also* 89 Fed. Reg. at 31,512 ("NMFS uses the maximum of the species-specific exposure modeling results"); 88 Fed. Reg. at 929 ("NMFS uses the 'worst-case' … species-specific exposure modeling results").

35.     In the Final Rule, NMFS imposes mitigation and monitoring requirements based on findings regarding the amount of marine mammal incidental take that would be caused by geophysical surveys. Those findings were based, in substantial part, upon the modeling that BOEM performed in its revised petition and in its associated NEPA review. That modeling produced substantial overestimates of the number of incidental marine mammal takes predicted to result from the geophysical surveys addressed in the Final Rule.

36.     Instead of using the best and most likely values for all of the input variables to the model, NMFS used overly conservative values for multiple model inputs that are not representative of actual conditions. The use of such values resulted in estimates of potential

marine mammal exposures to certain sound levels and derived estimated incidental take levels much larger than those that would reasonably be expected to occur. NMFS did not quantify, otherwise identify, or analyze the extent to which its modeling overestimated marine mammal incidental take. The various aspects of NMFS's arbitrary, overly conservative incidental take modeling are described in detail in public comments submitted by Plaintiffs in response to the 2018 Proposed Rule and the 2023 Proposed Rule.

37.    For example, NMFS's modeling used a seismic source array size (8,000 in$^3$) that is much larger than the most common array size used in geophysical surveys in the Gulf of Mexico, despite being presented with data and information during the rulemaking process regarding representative sound source levels for Gulf of Mexico geophysical surveys. This resulted in the model assuming a level of sound propagation by geophysical surveys throughout the Gulf of Mexico that is not representative of actual conditions. This, in turn, resulted in the model producing estimates of marine mammal Level A harassment and Level B harassment that are multiple factors larger than modeled estimates based upon the most common array sizes used in the Gulf of Mexico. NMFS's model also failed to take into account other known factors, or incorporate different approaches, that would reduce the level of estimated incidental take and thereby produce more accurate estimates.

38.    None of these modeling errors were corrected in NMFS's analyses and determinations regarding the levels of estimated take in the 2024 revisions to the Final Rule. Moreover, the observational record generated after the Final Rule was issued in 2021 demonstrates that NMFS's incidental take estimates substantially overestimate the amount of incidental take that actually occurs, further reinforcing the allegations and claims stated in this lawsuit and in Plaintiffs' comment letters.

14

39.     In the 2023-24 rulemaking, NMFS also made arbitrary and unsupported changes that further exacerbated the overestimates of Rice's whale incidental take. For example, NMFS added "buffers" to the Rice's whale "core habitat area" that have no factual or scientific bases. NMFS's addition of these "buffers," and its extension of Rice's whale density estimates into these "buffers," causes additional, unsupported overestimation of Rice's whale incidental take. Additionally, NMFS inaccurately states in the 2023 Proposed Rule that industrial activities, such as seismic surveys, may have caused shifts or declines in the Rice's whale population. There is no evidence to support this statement and the best available evidence contradicts this statement.

40.     NMFS failed to respond to detailed comments on the 2018 Proposed Rule analyzing the flaws in NMFS's conservative modeling analysis. 86 Fed. Reg. at 5,347. Among other defects, NMFS assumed overstated take estimates and compounded its errors by building other inaccurate assumptions on the overstated take estimates to produce a mathematically exaggerated estimate of takes. Instead of responding to those comments, NMFS erroneously stated that the comments did not specify which inputs were conservative, and otherwise ignored substantive comments by EnerGeo and API. *Id*. This response was particularly arbitrary given that NMFS did not publicly disclose its model inputs during either the rulemaking that led to the Final Rule in 2021 or the rulemaking that amended the Final Rule in 2024. NMFS also failed to respond to similar comments and questions on the 2023 Proposed Rule and incorrectly stated that it has already provided all requested information during the rulemaking processes.

41.     The regulations promulgated by the Final Rule include numerous new, different, and more stringent measures and conditions that apply to covered geophysical activities. Those measures and conditions are intended by NMFS to mitigate the amount of Level A and Level B harassment that NMFS determined would be caused by the geophysical activities addressed in

the Final Rule. Those measures and conditions have been and will continue to be included in the LOAs issued to geophysical survey operators, including Plaintiffs' members, and have adverse economic and operational impacts on Plaintiffs' members.

42.    The Final Rule also includes a seasonal coastal closure provision. 50 C.F.R. § 217.184(e) (the "Area 1 Closure"). NMFS's stated basis for the Area 1 Closure is to avoid additional stressors to bottlenose dolphin populations during the time period believed to be of greatest importance as a reproductive period.

43.    No harm to bottlenose dolphins from geophysical survey sound in the Gulf of Mexico has ever been observed. There is no evidence that sound from geophysical surveys contributes directly or cumulatively to dolphin late-term pregnancy complications or to perinatal and postnatal responses that would lead to increased calf mortality or other harm. In fact, bottlenose dolphins have been observed approaching and bow-riding geophysical survey vessels (and other vessels) with no apparent adverse effects from sound produced by the vessels. NMFS itself excluded bottlenose dolphins (and other small delphinids) from provisions of the Final Rule that require vessels to shut down their sound sources if marine mammals are observed within certain distances.

44.    There are many unleased blocks within the area covered by the Area 1 Closure. Because existing geophysical data in these areas is outdated and inadequate to inform decisions regarding future lease sales, the closure will impede industry's and BOEM's evaluations of blocks for future lease sales. The Area 1 Closure will significantly increase the likelihood that geophysical surveys will not be completed within a one-year permit term, thereby increasing the overall number of surveys that will need to be conducted, increasing costs, increasing operational

16

complications, increasing greenhouse gas emissions, increasing safety concerns, decreasing overall efficiency, and ultimately delaying or decreasing exploration and production.

45.    The Area 1 Closure covers the most operationally productive months in the Gulf of Mexico because poor winter conditions (including higher sea states and unpredictable wind patterns) have ended and the summer tropical storms have not yet begun. Accordingly, the cost to operate in Area 1 will be substantially higher than other areas and result in increased and inefficient survey efforts overall, as well as increased safety concerns due to adverse weather and ocean conditions.

## VI.    FIRST CLAIM FOR RELIEF

46.    Plaintiffs incorporate by reference all preceding paragraphs of this Second Amended Complaint.

47.    NMFS's modeling of potential impacts presumes that far more numbers of marine mammals will be incidentally taken than will actually be taken by the geophysical surveys addressed by the Final Rule, based on past and recent observations in the field for similar permitted activities.

48.    NMFS's marine mammal incidental take findings are not supported by the best available scientific evidence, ignore relevant factors, result from overly conservative modeling that does not accurately reflect the anticipated impact or amount of take, and fail to take into account marine mammal monitoring data collected from numerous geophysical surveys in the Gulf of Mexico. Consequently, NMFS inaccurately and grossly overstated the impacts of geophysical surveying in the Gulf of Mexico and the number of incidental marine mammal takes those surveys are likely to cause during the five-year period of the regulations.

49.    NMFS's incidental take regulations impose mitigation and monitoring requirements that are intended to reduce and minimize the impacts of the incidental take authorized by the regulations. *See* 50 C.F.R. §§ 217.184, 217.185. Because NMFS grossly overestimated the amount of incidental take and the impact of geophysical surveys, the mitigation and monitoring requirements address a false scenario that will not occur. Those requirements are overly burdensome and adversely impact Plaintiffs' members economically and operationally. Had NMFS accurately estimated the amount of incidental take and the impact resulting from geophysical surveys, the mitigation and monitoring requirements would not have been as burdensome or impactful on Plaintiffs' members.

50.    The Final Rule is premised on a false assumption that Gulf of Mexico geophysical surveys will have future negative impacts of a nature and magnitude that to date have never been observed, are unlikely, and are not representative of the best available scientific evidence. The mitigation and monitoring requirements therefore arbitrarily exceed what is warranted or practicable to avoid and minimize adverse impacts to marine mammals.

51.    The MMPA requires NMFS to objectively use the best available scientific evidence to determine the best and most accurate impact estimate and does not permit NMFS to overestimate the potential impacts based upon speculative assumptions that are not supported by the best available scientific evidence. The MMPA also does not permit NMFS to overestimate impacts for the purpose of being "precautionary" or "conservative"; nor does the MMPA permit NMFS to evaluate "worst-case scenarios," use modeling results "presenting the highest estimated take number for each species" or the "maximum of the species-specific exposure modeling results," or place a thumb on the scale in favor of the species when estimating and evaluating impacts.

52.     The APA does not permit NMFS to arbitrarily treat categories of uncertain information differently—*i.e.*, to conservatively estimate inflated numerical values for some factors to estimate adverse effects while simultaneously assigning *zero* value to other factors known to reduce effects.

53.     Neither the best available scientific evidence nor the administrative record as a whole supports NMFS's determination that the geophysical activities addressed in the Final Rule will incidentally take, by Level A harassment and Level B harassment, the numbers of marine mammals reported by NMFS. NMFS has not provided a rational explanation, based on record evidence, supporting its determinations regarding the amount of marine mammal incidental take associated with geophysical activities and the anticipated impact of those activities. By using a flawed model for estimating impacts with flawed inputs and assumptions, and by refusing to publicly disclose inputs to its model, NMFS failed to provide a full analytical defense of its model, as required by law.

54.     NMFS also failed to respond to substantive comments detailing the flaws in NMFS's take estimate methodology. NMFS's failure to respond to these comments demonstrates that it overlooked an important aspect of the problem, that it failed to provide a full analytical defense of its methodology, and that the take estimates are arbitrary, capricious, and contrary to law under the APA.

55.     For the foregoing reasons, by grossly overestimating the number of marine mammals to be incidentally taken by the geophysical activities addressed in the Final Rule, by overestimating the impact of those activities, by failing to provide a full analytical defense of its modeling and methodology, and by requiring mitigation and monitoring requirements based upon those overestimated effects, Defendants have acted in a manner that is arbitrary, capricious,

an abuse of discretion, and contrary to applicable law in violation of the APA, and that violates the MMPA.

## VII.    SECOND CLAIM FOR RELIEF

56.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

57.    The best available scientific evidence does not support NMFS's rationale that sound generated by geophysical surveys negatively impacts the bottlenose dolphin population in general or individual bottlenose dolphins in particular. Rather, the best available scientific evidence demonstrates that bottlenose dolphins are not negatively affected by the sound produced by geophysical surveys. The fact that the coastal bottlenose dolphin population may be affected by coastal pollution, vessel traffic in the estuaries, or endemic diseases is not a rational basis for restricting an activity that has no demonstrated adverse effect.

58.    NMFS's determination to impose the Area 1 Closure to ostensibly protect bottlenose dolphins is unexplained and arbitrary in light of its supported and reasonable determination that geophysical surveys pose no risk of harm such that shutdown requirements are unnecessary for bottlenose dolphins.

59.    The proposed Area 1 Closure is not supported by the best available scientific evidence, will not benefit marine mammals, will result in overall increased survey efforts at a much higher cost to operators and with a corresponding increase in safety concerns and other impacts, will have adverse operational impacts, and will hamper the ability of the U.S. to develop nationally strategic natural gas reserves contrary to established federal policy.

60.    NMFS failed to sufficiently consider the economic, operational, and environmental impacts of the Area 1 Closure. NMFS's practicability analysis of the Area 1 Closure was insufficient and failed to consider all relevant information and all of the best

20

available scientific evidence. NMFS unreasonably and arbitrarily discounted and failed to reasonably respond to information provided during the rulemaking regarding the practicability of the Area 1 Closure.

61.    Neither the best available scientific evidence, nor the administrative record as a whole, supports NMFS's imposition of the Area 1 Closure and its associated practicability determination. NMFS has not provided a rational explanation, based on record evidence, supporting the Area 1 Closure and its associated practicability determination.

62.    For the foregoing reasons, by including the Area 1 Closure as a requirement of the Gulf of Mexico geophysical survey incidental take regulations, Defendants have acted in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to applicable law in violation of the APA, and that violates the MMPA.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that Defendants, in issuing the Final Rule and promulgating the incidental take regulations, violated the MMPA and the APA for the reasons set forth in this Second Amended Complaint;

B.    Vacate or enjoin implementation of the Area 1 Closure, 50 C.F.R. § 217.184(e);

C.    Remand, without vacatur, the remainder of the Final Rule for NMFS to address the deficiencies identified in this Second Amended Complaint;

D.    Award Plaintiffs their reasonable attorney fees, costs, expenses, and disbursements, including attorney fees associated with this litigation, pursuant to the fees and expenses recovery provisions of the Equal Access to Justice Act; and

E.    Award Plaintiffs such other and further relief as this Court may deem just and equitable.

DATED:  May 15, 2024.

/s/ James A. Holmes_____
**JAMES A. HOLMES – BAR #20571**
**CHRISTOVICH & KEARNEY, LLP**
Pan American Life Center
601 Poydras Street, Suite 2300
New Orleans, Louisiana 70130-6078
Telephone: (504) 561-5700
jaholmes@christovich.com

**RYAN P. STEEN (*pro hac vice*)**
**JASON T. MORGAN (*pro hac vice*)**
**STOEL RIVES LLP**
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
ryan.steen@stoel.com
jason.morgan@stoel.com

**ARIEL STAVITSKY (*pro hac vice*)**
**STOEL RIVES LLP**
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: 503-294-9354
Facsimile: 503-220-2480
ariel.stavitsky@stoel.com

*Attorneys for American Petroleum Institute and EnerGeo Alliance*